Case 16-5244, Kenneth E. Savage v. FedEx Corporation et al., argument not to exceed 15 minutes per side. Mr. Romer Friedman, you may proceed for the appellant. Good morning, Your Honors. My name is Peter Romer Friedman. I represent the plaintiff appellant, Lieutenant Kenneth Savage, in this appeal. I'd like to reserve three minutes. May it please the Court. This is a case that arises under USERRA, the federal law that protects our brave service members and veterans to go on military leave, to not be discriminated against, to not be retaliated against, and to have their pension contributions continued when they serve in the armed forces. My client, Lieutenant Savage, worked for 11 years as a mechanic at FedEx. He had a perfect record, seven out of seven on his evaluations. He won awards from the FAA, from FedEx for his service, for his teaching other mechanics. Unfortunately, he started complaining about his fellow service members and him not receiving the right pension contributions in the summer of 2012. In August, when he comes back from military leave, he complains to his supervisor, Mr. Turnipseed. He complains to his human resources advisor, Mr. Lott. Within a month of that, he finds himself interrogated, suspended for an alleged discount shipping violation, terminated a week after that. You said it was an alleged violation. Do you concede that there was, in fact, a violation? We concede that, as written, the amended policy that was amended about a week before he was suspended made clear that he was violating the policy. And we concede for the purposes of this appeal, in this case, that he should have been disciplined or should have taken some sort of disciplinary action against him but not necessarily terminate it. And as the jurisprudence of this court makes very clear, when you're looking at the affirmative defense that FedEx must prove whether he would have been terminated in the absence of discrimination or retaliation, it's not good enough just to show that he could have been terminated. They have to show to a reasonable juror that it's an incontrovertible fact that he would have been terminated. And FedEx can't do that here for a number of reasons. We think this case, Judge Batchelder, comes down to three issues. One is the standard review of summary judgment, which is that the evidence and all credibility determinations have to be given to my client's favor. Second, the standard review in NUSERA of discrimination and retaliation under 4311C of Title 38 is very favorable to the plaintiff. We only have to show that there was a motivating factor of discrimination or retaliation in the decision, but then the burden of production and proof goes to FedEx to prove that he would have been fired. Are you saying the motivating factor was his service or his complaining? It's both. I think the best evidence we have, to be frank, is that he complained and immediately after that, within a month, he was suspended and terminated. Is there any evidence that somehow his service had ever worked against him at FedEx? Yes, Your Honor. There is specific evidence about hostility towards his service as well as the service of his coworker and friend Cliff Cunningham. Mr. Savage was written up by his supervisor previously for taking too much military leave during the peak season when the holidays, like right now, and it wasn't his choice at that time to take military leave. He took the military leave and served and was written up. His fellow coworker Cunningham, around the same time period, was actually taken off a shift, a preferred shift that would have paid him more money because he took what the company thought was too much military leave. So I think the case for retaliation. Counsel, do you have any information through your discovery, how many service people that are in FedEx's employee demographic in your area? I don't believe that that evidence is in the record, Your Honor. I would say, though, that as this court and the Supreme Court have repeatedly said that the fact that a service member or the fact that a person, one class, is treated well in the company does not tell anything about whether in another case, in the plaintiff's case, whether that person was discriminated against. Likewise, the same group defense, in terms of the decision makers, has no bearing on whether, in this case, my client was subjected to discrimination or retaliation. When you say he was written up, was there anything beyond just something in his record? I mean, was there any actual adverse action taken against him? Not at that time, Your Honor, but I would point to the Hans decision, the decision that you wrote, Judge Batchelder, in Petty, and the Bobo decision that Judge Strange wrote for opinions of the court. When looking at USERRA discrimination retaliation claims, this court doesn't ask, was the act of hostility towards a service member an adverse action? The adverse action here is he was suspended and then terminated. But when you look at what could be inferred, a reasonable juror could infer, in terms of the motivation for these later adverse actions, it doesn't matter whether the specific hostility before constituted an adverse action. Although in a deposition, my client's supervisor, Troy Turnipseed, looked at a chart of essentially his permanent record of write-ups from his 10-year, 11-year history, and I believe that this would have been on it. So, in other words, in Hans and in Bobo and Petty, this court and other courts have said, if there is discomfort or hostility or uncomfortability by the supervisors, by management, with a person taking military leave, that is very good, either direct or circumstantial evidence, of later discrimination or retaliation against that individual. I think that my client can prevail in his case under retaliation or discrimination, and they are separate claims. The most significant evidence, I think, here is that we have strong evidence of retaliation. We have a month of temporal proximity, which puts it well within this court's jurisprudence for either finding that temporal proximity alone or in combination with other factors can demonstrate a prima facie case of retaliation. We have not just hostility towards my client, but towards other service members. We have an unrefuted point in this case about my client's leadership on behalf of himself and others, that under the right line of cases, W.F. Bowen, and this court's published opinion in the 1990s, says that if my client was leading on behalf of other service members, which he indisputably was, there's an inference that when he was terminated shortly after that leadership, that he was subjected to retaliation. And then, of course, I think the most overwhelming point for my client here is that, on the retaliation claim, is there were three other individuals who committed similar or even more egregious violations of the discount shipping policy. They were not terminated. They were given warning letters and suspended. Two of those occurred before, Mr. Franklin and Mr. Melgar. One, Ms. Perrin, occurred after, but not so far off in time, only a couple months afterwards. And so... I was looking at those because those seem to be a very different treatment. Are they outside the protected class? Did they make complaints? Help me understand how they fit within his protected class. Well, my client, in his declaration, he said that Mr. Melgar was not in his protected class, was not in the military. There is no record evidence either way about the other two, about Franklin and Perrin, although I would note on the affirmative defense that FedEx has the burden of proof. FedEx does not provide any evidence about the protected status. And if you look at this court's decision in Hans, following the Federal Circuit's factors in Sheehan, the language that this court used to describe what can prove a motivating factor, it doesn't say there has to be disparate discipline or adverse action with respect to someone in another class. It just has to show that the plaintiff was treated differently than other workers. And if you, you know, at the end of the day, when you're looking at the affirmative... Wouldn't it matter if they were service people also? I think it would matter in terms of the weight. But in terms of the ultimate question of whether my client would have been terminated, I don't think that it matters. And, you know, here there is no record evidence that any of these three filed a complaint, Franklin, Perrin, or Melgar. And that's crucial because when you have such close time between the complaints and the termination and suspension, and you know that all of these, two of these three complaints, two of these three other workers, they appealed to a higher corporate level through the guaranteed fair treatment process, as my client did. So you're talking about a higher corporate level of evaluating these termination decisions. You see that the higher corporate level was lenient towards other people. And Franklin is the most, I think, almost common because he had longevity. He had, you know, a less terrific record in terms of performance. And give me, in light of, let's assume that that does make a prima facie case. I think you would probably agree that they have stated a reason the violation would carry their next step. So now we're in pretext. So what's your, or, well, no. If we're not doing it that way, if we're doing it, then they have to come forward and show that they would have fired him anyway. That's correct, Your Honor. To prove that, when you're talking about pretext being an issue, in the USARA cases, unlike McDonnell Douglas in Title VII, FedEx has the burden of proving the absence of pretext. And as Judge Batchelder wrote in the Petty decision, the fact that there could be one possible legitimate motive, which we acknowledge here there could be, does not mean and prove that they would have. And if you look at Arroyo, Bennison, Arroyo, the Seventh Circuit case, Bennison, the Sixth Circuit case, and Bobo, those are cases where you have evidence of other people who were not fired for the same offense. And whereas here, you know, you do have evidence. But that just proves that they would have fired him anyway. That's correct. And I think if you look at the Seibert v. Home Depot decision, it's a published Sixth Circuit opinion, in that case there were 18 other people who were fired for the same minor offense. And when the court had to look at it and say, well, could a reasonable juror conclude that this person would be fired for such a minor offense, the court said, this seems incredibly unfair. But the only testimony by the person who was making these decisions is they were very hard on this particular minor offense. And all 18 were fired. Here we have a supervisor who put in a sham, undated declaration that says, we decided it would be consistent with FedEx policy to fire Mr. Savage for this particular violation. There's no who, what, where, when, why. There's no description of who. And he says, I'm not aware of anyone else who was not terminated, you know, contrary to the production on FedEx letterhead of documents showing three others were not terminated. And so, you know, at that time, all we had, all a reasonable juror could see here, is a very conclusory description of, well, it was consistent with policy without describing why. I'm a little confused by something you just said. Could FedEx have carried its burden by showing that there were others who had used the shipping discount, at least somewhat comparably, and they were fired? I won't concede that, Your Honor, but I think that that would be more persuasive than what they did, which was providing no evidence of anyone who made a comparable violation was terminated. And I'll reserve my time. Thank you.  May it please the Court. I am Tarrin Treed, and I represent the Appellee Federal Express Corporation in this appeal. Your Honors, the district court got this exactly right. And its decision should be affirmed for three reasons. First, Mr. Savage did not establish his prima facie case of discrimination or retaliation. And under the USARA burden shifting, he has the initial obligation to establish, by preponderance of the evidence, his prima facie case. And Judge Anderson found that he did not do that. Secondly, FedEx did proffer unrebutted proof that it would have terminated Mr. Savage, regardless of his military status or any protected activity. And third, with respect to the retirement benefits issue, Judge Anderson was absolutely right. Mr. Savage did not put forth any evidence or any explanation as to how he contended that FedEx miscalculated his retirement benefits. And he tries to raise a completely brand new argument on appeal. Your Honors, Mr. Savage, in essence, says that he was terminated because FedEx harbored some anti-military animus toward employees in the military. But all the record- Not particularly against him for taking so much time, for serving so many times. Correct? Yes. But Judge Strange, all the evidence in the record is to the contrary. And I want to walk through that, because this is the unrebutted evidence. First of all, FedEx hired Mr. Savage when he was already in the Naval Reserve. And so FedEx knew that he would be taking military leaves of absence when they hired him. Under the same act or inference that this Court has adopted in McCarrelly v. Alfred Williams, it's suspect to claim that FedEx hired Mr. Savage and all the other employees who are in the military and then suddenly developed some aversion to employees in the military. Why was he written up for taking leave for military service? Okay. First of all, he was not written up. He received a counseling, which is undisputed that that's not disciplinary in nature. And Mr. Savage admitted that himself in his deposition. All it was is a counseling, which is a training tool, and it memorializes a conversation that one of his previous managers, who didn't have anything to do, had retired by the time of the termination decision, a conversation with him. The issue was Mr. Savage. He took write-ups. I'm sorry, Mr. Reed, do you dispute that those write-ups, which were nondisciplinary in nature, as you just indicated, had to do with his taking leave for military service purposes? Did the write-up, I mean, was it about his time off for military service? This is what it was about. He told his manager that he had to do, he had to complete military training during FedEx's peak season. And FedEx's peak season is about the beginning of December through maybe the second week of January. And so when his manager called his superior in the Navy, he said, well, he can do training whenever he needs to. And so the discussion was, listen, if you have to take training by a certain time, that's one thing, but you shouldn't tell us that you do when you can take it whenever you want to. And that was a conversation that was memorialized. Was that memorialized in the record? Yes, that's in the record. That's in the write-up, so to speak, that we've been talking about, this explanation? Yes, it's in the counseling that he received. The counseling document. Right. And let me just explain the difference, by the way, between Just to make certain I'm sure that I understand what you just said. So the reason this was written up is because Mr. Savage represented that he was required to take training during a specific period, FedEx's peak time, when in fact he could have exercised judgment and taken that training at some other time less critical to FedEx's operation. Is that correct? That's right. It was just a communication issue. And so FedEx does that as a training tool. You know, listen, this is how we should approach this in the future. That's all it was. A disciplinary letter, on the other hand, has consequences to it. So, for example, if you get three within a 12-month period, you'll be terminated. If you want to transfer, you can't while you have an active disciplinary letter on file. And it also affects your performance evaluation, which affects your annual increase. A counseling has none of those consequences. Not only did FedEx accommodate Mr. Savage, it went above and beyond and bent over backwards to try to accommodate his military obligations. So for the 11 years that Mr. Savage worked at FedEx, he took 55 military leaves of absence. It's undisputed in the record that FedEx accommodated each one of those, that they scheduled around those, and not only that, FedEx allowed Mr. Savage to what we call jump seat. And jump seat means that he can fly on a FedEx plane to go and fulfill his military obligations. So Mr. Savage had to frequently fly back and forth from Memphis to New Orleans in order to fulfill his military obligations. And FedEx, although it didn't have to and certainly wasn't required under USERRA, they allowed him to fly on FedEx planes to do that. They also allowed him to take computer-based Navy training on FedEx's computer, and most importantly, while he was on the clock at FedEx. So FedEx paid for him to take Navy training. I mean, I'm not sure what all FedEx could have done more in order to accommodate Mr. Savage and help him with his military obligations. Now, his attorney makes an excellent point that in his 11 years, until he was terminated, he didn't have any military obligations. He didn't receive any discipline at FedEx. And this is even though he was caught, for instance, sleeping on the job. So FedEx could, if FedEx really wanted to target him or discriminate against him, they certainly had the opportunity. But Mr. Savage's attorney is right. He didn't receive any discipline, any adverse action during his 11 years before he was terminated. He did get good performance evaluations, which meant he did get annual salary increases. And any time throughout those 11 years that Mr. Savage would make a complaint or raise an issue about the way he felt that he was being treated because he was in the military, this is in the record that Mr. Savage agrees that FedEx resolved those issues to his complete satisfaction. And this court in Escher found that there was no hostility when a manager, quote, ultimately responded to Escher's concerns in a way that was satisfactory. And that's what we have in this case. We also, to Judge Donald's point, FedEx routinely hires many people who are in the military, and it actually is in the record, that within Mr. Savage's group, there were several members of the military. So he was a mechanic. They mentioned by name three other mechanics that FedEx hired in his group that are thriving, that are still there, that are in the military. That are still getting compensation increases and so forth. And in addition, there's also evidence that none of his managers ever said anything that would reflect any kind of anti-military animus toward him. Why do you say that they made statements to Cunningham? Okay, first of all, Your Honor, that is a brand new argument that was not raised in the district court. I mean, we're hearing about that for the first time on appeal, is the first thing. And if you look at, so when I saw that for the first time on appeal, I went back and looked at what Mr. Cunningham was talking about in his deposition, and he says that it was his interpretation that a former manager, Dana Jones, who didn't have anything to do with the termination decision, transferred him to a shift that he just didn't want. He just didn't care for. He preferred his other shift. That was his interpretation. But Mr. Savage shouldn't be able to raise a brand new argument that the district court was not able to consider. And that's what he's doing. And it's completely irrelevant because the issue with that manager, that manager didn't have anything at all to do with this termination decision. The reason that Mr. Savage was terminated is crucial to this case. Because he was terminated because his name appeared on an automated quarterly audit that is generated. It's not a person that comes up with a list. It is based off of the top 10 employees who have, well now it's 30, but during this period it was 10, the top 10 employees who have the highest use of their employee discount. So as this court found in Escher, it's not like there was a manager who targeted him or somebody put his name on the list. His name... Okay. As your honors have probably noticed, Franklin and Perone were not identified in the district court. Their names never came up. I went back through the briefing. Their names are nowhere in the briefing. Again, and this seems to be a trend and a pattern, but Mr. Savage is raising several times new arguments on appeal. And that's improper. But he has, one of the ways that he can establish his prima facie case is to show that similarly situated comparators were treated differently. But he has the burden of establishing that they're similarly situated. And he hasn't done that. He hasn't put forth any proof that they're similarly situated. In fact, with the inadmissible freestanding letters that he attaches, it should... I thought those were letters that appeared on company letterhead and under the rules of evidence are admissible. Under the rules of evidence, they might be authentic. But that doesn't mean that they're admissible. Because they're still a hearsay issue and they're still a foundation issue. And if they are not, if there isn't any evidence to show that they're similarly situated, then it's irrelevant. And it's not. Franklin Peron did not have the same managers or management chain that Mr. Savage had. And this court has held that when the issue is disparate discipline, like it is in this case, and he's saying, well, they were disciplined differently than I am, then one of the relevant factors to establish whether they are similarly situated is whether they had the same management chain. And one, not only is there no proof of that, but if you look at the inadmissible letters, it shows that they didn't have the same manager. And it shows that they didn't have the same HR advisor. And it is the HR advisor's job to make sure that FedEx applies its policy and its discipline consistently. So if Franklin and Peron and Melgar, if there's no evidence that they were similarly situated, then the way that they were treated is irrelevant. And to this case. And the district court... If you got past the prima facie case and you were to the second stage of having to show that you would have, that FedEx would have discharged him anyway, and you have these comparators who have violated, comparably violated, but are not fired because they have a good record, how does that compare? How does that fit into your burden to show that you would have fired him anyway? Okay. But there are some assumptions in there that FedEx doesn't accept. Because there is absolutely no proof that there was any comparable, that their alleged violation of this policy was comparably as serious as Mr. Savage's. There just isn't any. And it is, if Mr. Savage is going to establish his prima facie case, he's got to establish that. What is in the record, what we know is that for Mr. Savage, between March of 2012 and August of 2012, he used his employee discount 90 times. And over a two-year period, he used it over 200 times. And when he was being interviewed by the security specialist, he was being interviewed by the FBI. And the FBI specialist, who did not know he was in the military, and that's important, he admitted, and this is where the admission comes in, he admitted that he and his wife sold various items. And he went through the laundry list of items that they sold, all kinds of, most of it was... Would that not indicate that he thought that using the discount or free shipping was not a violation of the policy? No, because... Why not? I mean, here he is, he's been called in and he's having to explain it. If he knew that it was a violation of the policy, you'd have thought he wouldn't have admitted it. No. Your Honor, for the 11 years that he was there, the policy was very clear, that you cannot use your employee discount to make money. And that's exactly what he was doing. Mr. Savage's attorney said, well, you know, a couple of weeks before he was terminated the policy, the policy changed. That's a red herring. The policy just, at that point, used examples of eBay. You can't put this on eBay. The new policy specifically. The new policy. You can't use it the way he had been using it. Well, no. The way he had been using it was to generate money. And throughout his tenure at FedEx, it was clear that using your employee discount for a commercial purpose or to generate money was a violation of policy. Was this the first time he had shown up on one of the lists? Yes, it was. Is that list randomly put together? I mean, why, if he's been doing this all this time, is this the first time he shows up on the list? Because what he testified to was that he and his wife were planning on moving. And so they were just clearing out certain things in their adding. During this period is when he really, it was a concentrated time where he used it more to generate money. More than any other time. So before that, he'd just been overusing it. Now he's using it hugely. Well, now he was one of the top ten people using it. Whereas before, he was using it a lot. But you can use it an abundant amount. But if you're not in one of those top ten, then you don't show up on the list and you're not investigated. But you know, Mr. Reed, your explanation just now, though, would not seem to explain why it just showed up on FedEx's list now. Mr. Savage cleaning out his attic wouldn't affect anything that's happening at FedEx and the generation of that list, would it? I'm not sure I understand. Yes. No. I mean, in essence, he was having a garage sale. So when I said he was cleaning out his attic, I'm saying he was taking that stuff, he was listing it for sale and he was using his employee discount. He was advertising free shipping to these consumers that he was selling it. That's the tie. Well, now I explain. Thank you. And prior to that change, which made it explicit, mentioned eBay explicitly, prior to that the policy was you can't use it for commercial purposes? It had always and remained that you could not use it for commercial purposes. With the evolution of time and eBay being a factor now, they just use that as an example. But it didn't change the policy. You still couldn't use it to generate money. And he had been doing that. And he admitted to doing that. And so USERA does not force FedEx to disregard a gross violation of policy. And it was a security specialist who had no idea that he was in the military when she investigated this and she made the decision that he committed a gross violation of policy. Fire anybody else on the top ten? Well, the security specialist doesn't terminate anybody. She turned her findings over. Yes, but FedEx terminates people for this. I've been at FedEx over ten years and I will say this is probably what people get terminated for the most, just in my experience. Does the record reflect that? What it reflects is that the HR person who makes sure that this is consistent has said that everybody that he knows of who's violated this has gotten terminated. Now that doesn't mean, and I'll admit, that doesn't mean that everybody at FedEx gets terminated for this. But everybody who that particular HR person is annexed to, he's saying, I don't know of anybody who violated this policy who was not terminated. And you had, though, in the record below, Melgar, right? You said Franklin and Jerome were new, but Melgar was not. Mr. Savage did identify Melgar in the lower court. But, again, he never... He was a comparator who was not fired for a comparable violation of the policy. No, it was not comparable and there's no evidence that it was comparable. Why was it not comparable? Why is there no evidence that it was? First of all, you said it wasn't comparable. So tell me, why isn't it comparable? Okay, two things. I want to make clear there's no evidence that it was comparable. Now, out of the record, because it was Mr. Savage's burden to do that, but it's my understanding, which is not in the record, but that Mr. Savage's girlfriend used this one time to ship something. And she complained because there was... Mr. Savage's girlfriend? I'm sorry, Mr. Melgar's girlfriend. And she complained because of the delivery, it was late or something like that. And then FedEx was like, well, who are you? And so she said it and said, well, you're not supposed to be using it anyway. So let's assume that that is in the record. That's not a comparable seriousness that his girlfriend used it one time. Now, Mr. Savage said, well, that's worse because you had an unauthorized person using it. Well, FedEx doesn't think that's worse. And again, all this is hypothetical. And I'll say this in closing, but Mr. Savage had subpoenaed Mr. Melgar and we were prepared to travel to Miami because he's not similarly situated in the same management chain, doesn't work in the same city. But we were going to travel to Miami to take his deposition. And then the day before, he canceled it. So he had every opportunity to get admissible evidence on Mr. Melgar and just chose not to. I have a question on the pension before you sit down. I know you argue that it was waived. So you do not respond to the analysis of FedEx's violation of the 12-month look-back rule under USERRA. So how do you respond to the argument that was made that by calculating his pension benefits using an average of his earnings, that it should have been using an average of his earnings over the prior 12-month look-back period? Well, FedEx did use the 12-month look-back to calculate his rate of compensation. But did they do it based on times at which he was then working versus a complete look-back for the 12-month time period prior? To establish his rate of compensation, they used the 12-month look-back. To determine the hours that he was on leave, they looked at his schedule of when he was out on leave. So the question becomes, what is your response to the claim  that even though you have the amount of his wages calculated with the 12-month look-back, did you not also need to calculate the amount of time based on the previous 12-month period as well? And this is understanding that this argument was never raised in the lower court and they had the opportunity to look at it for the first time. My question is, are you doing it right or are you doing it wrong? We're doing it right. By that double step, calculating the amount by the 12-month look-back but calculating the time by the current employment period? Yes. If you look at that language that talks about the 12-month look-back, it only refers to the rate of compensation. And it has two terms. It uses the term compensation, quote, and it uses the term period of service. But what Mr. Savage is arguing is that compensation encompasses period of service. But under the rules of statutory construction, if you have two separate terms that appear in the same statute, they have separate meanings. But when the statute refers to, if you can't be reasonably certain what the rate of pay is, you have to use the 12-month look-back. But it doesn't say anything in that 12-month look-back section about any imputed hours. It only refers to... Or any method of determining what the hours would have been. Exactly. So that is a current day calculation in the pension plan now. You do it one look-back, one current. Right. Well, yes. One look-back and one, okay, when was he actually on military leave? And that's what we looked at. And how do you decide, since he was on military leave, how many hours he would have worked had he not been on military leave? Well, we look at his schedule. And we look at when he was out. So let's say he was out. He says, I need to be out on Monday. We look to see, all right, how many hours were you scheduled to work on the Monday that you were out? And we use those hours. So the advanced scheduling you use for the current time. Yes. Thank you. Thank you. There's a lot to digest there, but let me start with the point about the three other workers, Franklin and Parr and Melgar. So if you look at page 996 of the record, which is paragraph 43 of my client's statement of material facts, in the district court it says, Other FedEx employees, including Betty Parr and Antoine Franklin, were also given warning letters. And above it talks about Melgar. So there's no doubt that these letters were introduced on corporate letterhead, as Judge Tranche points out, which makes them self-authenticating, and that this issue of the other workers was raised below. So it shows that they were inside or outside the protected class. Well, again, I'll go back to Hans. Hans doesn't say they have to be in a different class to show that there was unfavorable treatment for the plaintiff. And if you're looking at the affirmative... You would assume that he would have to be showing they're not military and they got taken care of. I'm military. I didn't get taken care of. Under Title VII, that's right, for the fourth step of the Prometheus case. Under USERRA, any factor showing that... Motivating factor. How does it become a motivating factor if they were also military? Well, if they didn't make complaints, for example, which there's no evidence that these people did make complaints, that would help toward showing it's a motivating factor. But if you look at this in terms of FedEx's affirmative defense, they have the burden of proving they would have made the same decision. They have the burden of getting through the Prometheus case. Well, I would proffer that if you put aside these three other people, you have more than enough between the leadership, the temporal proximity, and the hostility towards my client to show motivating factor. Even one of those could suffice. I would point out that, and I don't want to dwell on the discipline a number of years ago by his prior supervisor, but USERRA protects voluntary or involuntary service. So my opposing counsel here just admitted that FedEx has a pattern or practice, apparently, of telling service members they need to schedule their voluntary military service around their leave, which is illegal under USERRA and is very troubling. It's also troubling that he tried to suggest, without pointing to any evidence in the record, that Melgar's violation was different than my client's violation. There is undisputed evidence that FedEx, the investigator, the decision makers in terms of the termination, they didn't care whether there was zero, one, two, or 90 violations. They didn't look to see, they didn't analyze the actual shipments to see how many violations there were. It's hard for a reasonable juror to believe that these are different violations. If FedEx, their corporate representatives said they didn't care how many violations there were, if anything, it shows they were out to get my client because they went into this investigation. They said, the investigator, all we wanted to know was that he admitted violating this policy. Once we did, we had his suspension letter already written up to give to him immediately after he left, which a reasonable juror would suggest the investigation was planned to terminate him, whereas the others, who were not terminated, there was no such determination that they were going to be fired. One last quick question. How do you respond to the analysis on the pension issue? Let me unpack that for you, Judge Ranch. First off, the gravamen of my client's complaint at the district court level, and I admit it wasn't crystal clear, but the gravamen of his complaint was that his overtime, the hours he worked above his normal schedule were not being included in the 12-month look-back. FedEx admits that's what he was complaining about at district court level. Second, the main way that their formula violates the law and, again, we dispute no fact, this is a purely legal question at this point, the main reason why it violates the law is it doesn't take into account the amount of time he works, i.e., overtime. So, you know, and if... So if he had a schedule, he would not know until the day of whether he was going to work overtime? Well, it's not that. Let me take a step back. The whole purpose of 4318B, B3B, the not reasonably certain provision, is that if someone works on commission on overtime, you wouldn't know week to week how much they're going to make, right? Because you can pick up an overtime shift, your manager can say, hey, Mr. Savage, can you work a second shift? And he'd say, okay, fine, and he'd work a second shift, or he'd pick up another day during that week, right? If it's not reasonably certain how much you're going to work, that causes it to... you wouldn't know how much over the period of the military leave that person would have earned, right? So what Congress did very smartly is they said, let's create a bright line rule for how to figure out what their compensation would be for the purposes of determining, you know, let's say it's 10%, it goes into your 401K of your, you know, of your salary. What is the 10% of? What is the compensation? And that compensation is the average earnings, the average rate of compensation during the 12-month prior period. It's a complete look back. Step one, we got it. We look back 12 months. So how do you do step two? Well, there is no step two. And if you look at the House report and the Senate report, the legislative history of USARA that we've cited, they talk about the earnings. The 12-month look back looks at the earnings. There is no bifurcation. There's just looking at... So let me give you... You get the average wage, and now you say, I am on leave from December 1 to December 8 this year. I look back to December 1 to December 8 last year? No, Your Honor. How is your methodology? How does it differ from what your co-counsel suggested? So the way that you do it in every instance, the statute says you take the average earnings from the 12-month period. So you would say, okay, over the last 12 months, he earned $52,000, right? So therefore, each week, his earnings would be $1,000. And you would just say, okay, he was gone for one week on military leave. $1,000 is the compensation. Let me explain to you why this, every time this violates, this actually shorts the service member. They've made it more complicated to short service members because the 12-month look back they do is just to figure out the hourly rate. And so rather than being the normal hourly rate, if someone's worked a bunch of overtime, it may raise a little bit the effective hourly rate, right? Because you're making more for overtime. But if you only multiply that hourly rate by the 40 hours he's normally scheduled for, at the start of every week, it actually results in much less pay for that week than if you had just taken the amount of earnings he had made. Like if you compare someone who works 40 hours versus someone who works 50 hours every week, they're always going to make less. There's no possible way you can do the math to make the service member equal or better off under their plan. It always shorts them about 10 to 20 percent if you've made a bunch of overtime. And you say, give me a weekly rate. You were out a week. That's the money you get. Right. And this is how I've done two class action settlements with American Airlines, with United Airlines. And in those cases, the position of those airlines was that there should be some sort of actual 12-month look-back. And they have what's called pensionable pay. And they talk about it in their declaration. Pensionable pay is essentially doing that true 12-month look-back, saying, okay, in the last 12 months, Mr. Savage earned $52,000. So his weekly pensionable pay is $1,000 a month. It's simple. So every time he misses a week, he gets $1,000. Right. And the reason why my client really never understood what happened is because they wouldn't tell him how they were calculating it. This is an overly complicated way to do it. And at the end of the day, what that means is that the service member has no record or has nothing to point to to figure out if it was done right or wrong. If I could just... No. Well, thank you, Your Honor. And I appreciate all of your thoughtful questions. Thank you. The case will be submitted. And I think that was the last one to be heard this morning. You may adjourn the court.